# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION



THE ESTATE OF STEPHEN C.
POPOVICH, Individually
and as Successor in Interest to
Cleveland Entertainment Company, Inc.,
by and through the Estate's co-executors,
Stephen F. Popovich and Dominic Lemmo,
P.O. Box 89
Willoughby, Ohio 44096-0089,

       Plaintiff,

    v.

SONY MUSIC ENTERTAINMENT INC.
550 Madison Avenue
New York, New York  10022

      and

SONY BMG MUSIC
ENTERTAINMENT
a partnership of Sony Corporation of
America and Successor in Interest to
Sony Music Entertainment, Inc.
550 Madison Avenue
New York, New York  10022

      and

SONY CORPORATION OF AMERICA
a partner of
Sony BMG Music Entertainment
550 Madison Avenue
New York, New York  10022

      and

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO: 1:11CV2052

JUDGE JUDGE NUGENT

MAGISTRATE

MAG. JUDGE McHARGH

COMPLAINT

(Jury Demand Endorsed Hereon)

THIS IS A REFILED ACTION,
PREVIOUS CASE NO. 1:06CV1096,
PREVIOUSLY ASSIGNED TO
JUDGE NUGENT AND
MAGISTRATE JUDGE McHARGH

**BERTELSMAN MUSIC GROUP, INC.** :
**a partner of** :
**Sony BMG Music Entertainment** :
**c/o Corporation Service Company** :
**85 East Gay Street, Suite 706** :
**Columbus, Ohio 43215** :
:
       **and** :
:
**JOHN DOES 1 through 20** :
**Names and Addresses Unknown,** :
:
      **Defendants.** :

## COMPLAINT

Plaintiff, the Estate of Stephen C. Popovich ("Popovich" or "Plaintiff"), on behalf of itself and as successor-in-interest to Cleveland Entertainment Company, Inc., which owned the recording label Cleveland International Records, by and through the Estate's co-executors, Stephen F. Popovich and Dominic Lemmo, respectfully allege and aver as follows:

### NATURE OF ACTION

1.    This is an action for damages and equitable relief arising out of Defendants' ongoing, intentional, and malicious breaches of fiduciary duties, breaches of various contracts, and violations of certain state and federal statutes relating to Plaintiff's entitlement to the receipt of royalties and label credit in connection with Defendants' manufacture, promotion, sale, and distribution of various master recordings ("the Masters"), including but not limited to, four albums popularly known as "Bat Out of Hell," "Dead Ringer," "Midnight Lost and Found," and "Hits Out of Hell (collectively the "Albums"), as well as the master recordings embodied on the Albums.

2

## PARTIES

2.      Stephen Popovich was the youngest Vice President of Promotions at CBS

Records and the first recipient of that company's prestigious Clive Davis award for promotion.

As VP of A&R at CBS, he and his staff signed acts such as Boston, Wild Cherry, Ted Nugent,

Michael Jackson, The Jacksons, The Charlie Daniels Band, and REO Speedwagon. CBS and its

successors have received hundreds of millions of dollars in revenues as a result of acts signed by

Mr. Popovich. Due to his accomplishments, and among his many other honors, Popovich was

named one of Cleveland's 25 most influential natives, along with figures such as Henry Mancini,

Phil Donohue, Paul Newman, and Bob Hope. Popovich was recognized for his abilities as a

Grammy-winning producer, talent scout, and record executive.

3.      After leaving CBS, Popovich formed the corporation Cleveland

Entertainment Co., Inc. ("Cleveland Entertainment"). During its period of active operation,

Cleveland Entertainment had its principal place of business in Cleveland, Ohio. Popovich was

the majority shareholder of Cleveland Entertainment, owning 51% of its stock. Through

Cleveland Entertainment, Popovich originated, established, and promoted "Cleveland

International Records" as a trade name and a recognized and respected recording label.

4.      Stephen C. Popovich died abruptly on June 8, 2011. Prior to his death,

Popovich had the right to use the Cleveland International Records trade name and label and had

released and distributed a wide variety of musical recordings, including Grammy-winning

heritage, alternative, and country music, under the Cleveland International Records label.

5.      Defendant Sony Corporation of America ("Sony") is incorporated in the

State of New York, headquartered in New York, New York, and is the parent corporation of

SME. Sony is a subsidiary of Sony Corporation.

6.     Defendant Sony Music Entertainment, Inc. ("SME") is incorporated in the state of Delaware and has its principal place of business in New York, New York. SME is a wholly-owned subsidiary of Sony and is registered to do business in the State of Ohio. SME is responsible for Sony's global music sales (excluding Japanese music sales) and is the second largest global recording music company in the world.

7.     Defendant Sony BMG Music Entertainment ("Sony/BMG") was a 50-50 partnership between Sony and Bertlesmann Music Group and was created and registered under the laws of the State of Delaware. At times relevant herein, Sony/BMG was headquartered in New York, New York and was responsible for, *inter alia*, Sony's global music operations, including the licensing, distribution, promotion, and sale of the Masters at issue herein with offices in Argentina, Australia, Belgium, Brazil, Canada, Chile, China, Costa Rica, Czech Republic, Denmark, Finland, France, Germany, Greece, Hong Kong, Hungary, India, Indonesia, Ireland, Italy, Japan, Korea, Malaysia, Mexico, the Netherlands, New Zealand, Norway, the Philippines, Poland, Portugal, Russia, Singapore, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Arab Emirates, and the United Kingdom.

8.     As discussed below, Cleveland Entertainment entered into agreements with CBS Records, Inc. in 1977 and 1979, and Cleveland International Records entered into an agreement with CBS Records, Inc. in 1982. In 1987, CBS Records, Inc. was acquired by Sony and Sony renamed the record company Sony Music Entertainment. As a result, in or about 1991, SME became the successor in interest to CBS Records, Inc. with respect to the 1977, 1979 and 1982 agreements and other matters pertinent to this action.

9.     In or about 2004, Sony/BMG assumed all right, title and liability of SME with respect to the agreements and the matters hereinafter set forth. However, in 2008, Sony

4

purchased Bertlesmann's 50% stake and the company, once again was named Sony Music

Entertainment, Inc. and became a wholly-owned subsidiary of Sony Corporation through its U.S.

subsidiary, Sony.

      10.     An unknown number of John Does are subsidiaries, partners, licensees,

affiliates, joint venturers with, or directors, officers, agents, controlling shareholders or

employees of one or more of the named Defendants, and are responsible for the activities

complained of herein.

**JURISDICTION AND VENUE**

      11.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action

because there is complete diversity of citizenship between the parties, and the sum in controversy

exceeds $75,000, exclusive of interest and costs.  This Court also has jurisdiction because certain

of Plaintiff's claims arise under federal law.  Pursuant to 28 U.S.C. § 1367(a), this Court has

pendent jurisdiction over all non-federal claims in this action that form part of the same case or

controversy as those within the Court's original jurisdiction.

      12.     Venue lies in this district under 28 U.S.C. § 1391(b).

**ALLEGATIONS COMMON TO ALL CLAIMS**

      13.     On or about January 1, 1977, Cleveland Entertainment entered into an

agreement with CBS Records, a division of CBS, Inc. ("CBS").  As pertinent to this action, this

agreement was thereafter modified and extended on August 11, 1977; September 1, 1977;

September 10, 1979, and November 1, 1982.  This agreement, as modified, is referred to herein

as the "Cleveland-CBS Agreement."  The Cleveland-CBS Agreement is not attached because it

is voluminous and has been the subject matter of previous litigation.  A copy will be filed with

the Court upon its request or agreement of the parties.

5

14.     The Cleveland-CBS Agreement provided, *inter alia*, that Popovich would deliver to CBS master recordings ("Plaintiff's Masters") featuring artists under contract to Cleveland Entertainment, and CBS would manufacture, distribute, and sell records and tapes derived from the Plaintiff's Masters throughout the world.

15.     Pursuant to the Cleveland-CBS Agreement, CBS (and SME and Sony/BMG, as successors), obtained the right to distribute certain recordings embodying performances by the artist known as "Meatloaf." This right included recordings embodied on an album entitled "Bat Out of Hell," which had and continues to have phenomenally successful sales throughout the United States and the rest of the world and remains one of the best-selling albums of all time. The Cleveland-CBS Agreement also encompassed recordings embodied on albums entitled "Dead Ringer," "Midnight at the Lost and Found," and "Hits Out of Hell," which have had similarly successful sales. The master recordings from these four albums are referred to herein as the "Meatloaf Master Recordings."

16.     The Meatloaf Master Recordings have been re-released on literally hundreds of releases, including but not limited to, various compilations and anthologies, such as "Classic Rock 70's" and the "The Best of Love," which contain Meatloaf Master Recordings along with hits by other artists, produced under other labels, such as Phil Collins (produced by Atlantic Records), Rod Stewart (produced by Mercury Records) and The Righteous Brothers (produced by Curb Records). These releases are referred to herein as the "Releases." Sony's royalty reports to Popovich document the existence of more than 700 Releases.

17.     By virtue of the parties' agreements and statutory and common law principles applicable to the parties' relationship, at all pertinent times CBS (and SME and Sony/BMG as CBS's successors in interest), agreed and were obligated to act in good faith to

6

disclose all distribution and sales of all forms and configurations of any and all masters, including Plaintiff's Masters, to properly account for royalties owed on Plaintiff's Masters, and to properly and accurately give label credit to the Cleveland International Records label in the production, distribution, licensing, and sale of Plaintiff's Masters.

18.    Plaintiff has at all pertinent times reasonably and justifiably relied on the good faith and integrity of Defendants in connection with the commercial exploitation of the Plaintiff's Masters, as governed by the Cleveland-CBS Agreement. Pursuant to the parties' relationship under the Cleveland-CBS Agreement, and as a practical matter, Defendants at all pertinent times possessed knowledge and information superior to that possessed by Plaintiff with regard to the commercial exploitation of the Plaintiff's Masters.

19.    As a result of the Cleveland-CBS Agreement, Plaintiff's reasonable and justified reliance, and/or Defendants' superior knowledge about the commercial exploitation of the Plaintiff's Masters, a fiduciary relationship has existed and still exists between Plaintiff and Defendants. Accordingly, Defendants have been at all pertinent times, and are, under a duty to act in good faith toward Plaintiff, including a duty to disclose pertinent information relating to Plaintiff's Masters, a duty to properly and intelligibly account for, credit and remit royalties and other payments to Plaintiff, and a duty to provide proper and accurate label credit with regard to Plaintiff's Masters.

## THE INITIAL LITIGATION AND SETTLEMENT

20.     By the late 1990's, SME had failed to pay tens of millions of dollars in royalties on the Meatloaf Master Recordings.  As a result, Popovich was forced to take action against SME, including filing a lawsuit alleging fraud, breach of fiduciary duty, breach of contract, unjust enrichment, and violation of the RICO statute, 18 U.S.C. §1961, *et seq.*

21.     The parties reached a resolution of Popovich's claims, and on March 5, 1998, the Court of Common Pleas, Cuyahoga County, Ohio dismissed the lawsuit with prejudice based on the parties' submission styled "Stipulation of Dismissal with Prejudice" (the "Order").

22.     The parties agreed to the entry of the Order as a term and condition of a Settlement and Release Agreement entered into by the parties as of February 17, 1998 (the "Settlement Agreement").  A copy of the Settlement Agreement is not attached because it is voluminous and has been the subject matter of previous litigation.  A copy will be filed with the Court upon its request or agreement of the parties.

23.     As part of the Settlement Agreement, SME paid Plaintiff substantial sums for past due royalties and agreed on behalf of itself, its successors, and assigns to properly account to Plaintiff for royalties and timely pay all future royalties.

24.     At the time the Settlement Agreement was executed, SME had (in addition to improperly withholding royalties) distributed millions of copies of the Meatloaf Master Recordings (including approximately 10 million copies of a "Bat Out of Hell" CD) without the Cleveland International Records logo.  All label credit was actually given to Sony or Epic, Sony's own recording label.

25.     Plaintiff demanded and Sony agreed in the Settlement Agreement to provide proper production credit by adding the Cleveland International Records logo to all forms

and configurations of the master recordings embodied on the Albums after September 1, 1998 in

a manner set forth in the Settlement Agreement (the "Labeling Requirements"). The Labeling

Requirements were essential consideration for Popovich in entering into the Settlement

Agreement. This portion of the Settlement Agreement was added only as a result of Popovich's

demands, and he refused to agree to any settlement unless this issue was properly addressed.

### THE SECOND LAWSUIT

26.     Despite the clear terms of the Settlement Agreement, Sony did not comply

with the Labeling Requirements under the Settlement Agreement and the parties' prior contracts.

As a result, in 2002, Plaintiff was forced to file a second lawsuit against Sony to enforce his

rights.

27.     A jury duly empanelled by the United States District Court for the

Northern District of Ohio found after a full and fair trial that Sony/BMG had breached the

Labeling Requirements and awarded Plaintiff compensatory damages in the amount of

$5,057,916.00. The Court entered judgment in that amount on May 31, 2005. In addition, the

jury returned answers to specific interrogatories finding, among other things, that the parties'

contracts required Defendants and their licensees to give proper label credit to Plaintiff on all

forms and configurations of the Meatloaf Master Recordings, including compilations that contain

one or more Meatloaf Master Recordings.

### DEFENDANTS' CONTINUING FAILURE TO COMPLY
### WITH THE LABELING REQUIREMENTS

28.     After the verdict was returned in the second lawsuit, Plaintiff discovered –

incredibly – that Defendants still had failed to correct the labels on numerous forms and

configurations of the Meatloaf Master Recordings. Plaintiff notified Sony/BMG of this

9

discovery and demanded assurances that the failure would be addressed, as well as information relating to the identity and number of non-complying releases.

29.     Defendants have failed to respond to Plaintiff's repeated demands for assurances that Defendants will comply with the Labeling Requirements.  Defendants have also refused to disclose to Plaintiff how many additional non-complying releases or copies of those releases have been manufactured or distributed since the judgment was entered in the second lawsuit.

## DEFENDANTS' CONTINUING FAILURE TO PAY OR PROPERLY ACCOUNT FOR ROYALTIES

30.     Despite having previously been sued for failing and refusing to accurately report and properly account to Plaintiff royalties owed on Plaintiff's Masters, Defendants have deliberately and knowingly continued to fail and refuse to pay the proper amounts due to Plaintiff, and have fraudulently concealed the fact that substantial sums were owing to Plaintiff by Defendants, as set forth below and in other respects not yet known to Plaintiff.

31.     Defendants have used a variety of fraudulent devices in order to understate their liability for payments to Plaintiff, including but not limited to the following:

> (a)     Defendants improperly and fraudulently calculated the royalties owed on Internet music sales by, among other things, improperly characterizing those sales and by improperly deducting "packaging costs" despite the fact that no physical packaging is involved in those sales;

> (b)     Defendants have improperly and fraudulently calculated royalties owed on Internet sales by charging blanket license fees thus artificially reducing the licensing fees received from licensees for Plaintiff's Masters;

(c)     Defendants have improperly and fraudulently calculated royalties owed on foreign sales by charging foreign subsidiaries and licensees a separate "license fee" for use of Sony's labels thus artificially reducing the licensing fees paid for the Plaintiff's Masters;

(d)     Defendants improperly and fraudulently calculated royalties for sales of recordings based on the "black vinyl" base prices applicable to the sale of cassettes and vinyl records, notwithstanding the fact that the Cleveland-CBS Agreement requires royalties to be calculated on the basis of actual prices in effect, for other forms and configurations, resulting in a substantially higher liability for royalties on the part of the Defendants than the amounts Defendants have reported to Plaintiff;

(e)     Defendants improperly and fraudulently used inflated figures in taking deductions for excise taxes and similar taxes, such as non-United States Value Added Taxes ("VAT"), in order to calculate the wholesale base prices to which the applicable royalty rate is applied, whereas application of the correct figures for such taxes would result in a substantially higher liability for royalties on the part of the Defendants than the amounts Defendants have reported to Plaintiff;

(f)     Defendants improperly and fraudulently gave away excessive amounts of purported "free goods," which were nothing more than additional discounts afforded by the Defendants to their dealers and distributors, resulting in substantial understatements of the Defendants' liability for royalties to the Plaintiff;

(g)     Defendants improperly and fraudulently applied incorrect royalty rates to sales outside of the United States;

(h)     Defendants improperly and fraudulently used incorrect "retail prices" in calculating royalties due on certain sales outside of the United States; and

(i)     Defendants improperly and fraudulently deducted certain manufacturing taxes in the calculation of the prices of the goods against which royalty rates were applied, resulting in substantial understatements of the defendants' liability for royalties to the Plaintiff.

32.     By using the foregoing fraudulent devices, among others, Defendants understated their liabilities for royalties to Plaintiff by a substantial amount. While the total amount of the fraudulent understatement will be proven at trial, Plaintiff's preliminary examination of the limited portion of the Defendants' books and records which the Defendants have permitted the Plaintiff to examine, discussed in more detail below, supports Plaintiff's belief that the understatement is in excess of $3 million.

33.     Defendants knew or should have known that the methods used to calculate their liability for royalties to Plaintiff were improper, were contrary to the Cleveland-CBS Agreement, and were without any legal or factual justification whatsoever. Notwithstanding such knowledge and belief, Defendants repeatedly rendered to Plaintiff false and fraudulent semi-annual statements of account. These statements contained material false and fraudulent representations as to the amounts to which the Plaintiff was entitled, and concealed from the Plaintiff the various fraudulent devices the Defendants used in order to understate their liabilities for royalties to the Plaintiff.

34.     At all times pertinent to this action, Defendants had access to and knew the true facts concerning the foregoing, but repeatedly and deliberately misrepresented and/or failed to disclose the same to Plaintiff. Defendants did so knowing that Plaintiff would rely upon such misrepresentations and/or omissions to Plaintiff's detriment, and Plaintiff did, in fact, so rely to his detriment. Defendants made said false representations and/or omitted material information for the purpose of inducing Plaintiff to believe that the sums to which the Plaintiff was entitled under the Cleveland-CBS Agreement were substantially less than the actual amounts, and with the intention that the Plaintiff would forbear from exercising its right to conduct a full examination of the Defendants' books and records, which the Defendants knew would be an expensive and time-consuming matter and which the Defendants believed that the Plaintiff would be reluctant to undertake.

35.     Defendants have acted willfully, maliciously, and with gross and wanton disregard for the rights and interests of the Plaintiff.

## DEFENDANTS' REFUSAL TO ALLOW PLAINTIFF TO AUDIT ROYALTY STATEMENTS

36.     The Cleveland-CBS Agreement grants Plaintiff the right to conduct an examination of the Defendants' books and records in order to verify the statements rendered by the Defendants and to otherwise determine the extent of the Plaintiff's entitlement to payment. During the course of the Cleveland-CBS Agreement, the President of CBS expressly agreed that Plaintiff could conduct such an audit at any time without regard for the time period set forth in the Cleveland-CBS Agreement.

37.     Defendants have failed and deliberately refused to allow a full and complete inspection and audit. Notwithstanding Plaintiff's repeated requests, Defendants have

persisted in their refusal to make available its books and records necessary to permit the Plaintiff to conduct a complete audit.

38.    Defendants have further deliberately blocked Plaintiff's efforts to audit Defendants' books and records, refusing to provide basic information. Defendants have intentionally blocked Plaintiff's audit efforts both in retaliation for Plaintiff's previous efforts to enforce his rights and pursue his claims in the courts.

39.    Upon information and belief, the acts complained of herein are part of an institutional and systemic policy, practice, or decision by Sony and/or Sony/BMG and/or SME to avoid paying royalties by exploiting the fact that it is seldom cost effective and frequently cost prohibitive for an artist or manager or other person or entity to whom royalties are owed to pursue these claims, and that as a result many royalty claims will be abandoned altogether. Defendants engaging in the conduct described herein do so in order to improve profits at the expense of individuals and entities to whom royalties are owed. The withholding of royalties that are properly owed to artists and managers has the additional effect of artificially inflating revenue and/or profits on Defendants' financial statements.

40.    As a result of the foregoing, Plaintiff has suffered substantial damages, the precise amount of which will be established at trial, which the Plaintiff is entitled to recover from the Defendants, together with interest, costs, reasonable attorneys' fees, and treble and punitive damages.

## FIRST CAUSE OF ACTION

41.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs.

42.     By virtue of their relationship with the Plaintiff, and Defendants' unique possession of knowledge and information superior to that possessed by Plaintiff with regard to the commercial exploitation of the Plaintiff's Masters, Defendants owed to Plaintiff a fiduciary duty that included, among other things, a duty to provide diligent and faithful service to Plaintiff in the affairs described above.

43.     At all times herein, Plaintiff reasonably and justifiably placed a special confidence and trust in the Defendants' integrity and fidelity as a result of the parties' relationship and as a result of the contracts that gave Defendants a position of superiority or influence over Plaintiff with regard to the commercial exploitation of the Plaintiff's Masters.

44.     By reason of the conduct described herein and, upon information and belief, other acts not presently known to Plaintiff, Defendants intentionally and maliciously breached their fiduciary obligations to Plaintiff.

45.     Plaintiff suffered substantial injury by reason of Defendants' breach of fiduciary duty.

46.     By reason of the foregoing, Plaintiff demands judgment against Defendants in an amount to be determined at trial.

47.     In doing all of the foregoing, Defendants acted maliciously, willfully, and with gross and wanton disregard for Plaintiff's rights and interests. As a result, Defendants are liable to Plaintiff for punitive damages, plus reasonable attorneys' fees, interest, costs, and disbursements, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

48.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs.

15

49.     In accordance with the pertinent agreements, including but not limited to the Cleveland-CBS Agreement and the Settlement Agreement, Plaintiff has performed all acts Plaintiff was required to perform except where performance on Plaintiff's part was waived, prevented or otherwise excused by the acts of the Defendants.

50.     By contrast, as described above and, upon information and belief, by virtue of other acts not presently known to Plaintiff, Defendants have materially breached their contractual obligations under the parties' agreements by, among other things, engaging in the conduct described in paragraph 31, by failing to properly account for, credit and remit royalty and other payments, and by failing to properly credit Cleveland International Records on Plaintiffs' Masters.  Plaintiff has suffered substantial injury by reason of Defendants' breaches of their contractual obligations.

51.     By reason of the foregoing, Plaintiff demands judgment against the Defendants in an amount to be determined at trial of this action.

52.     Defendants' breaches of their contractual obligations to Plaintiff are tortious and part of an institutional and systemic pattern and practice of failing to properly account for and pay royalties and failing to otherwise honor their contractual and legal obligations.  Defendants' conduct has directly and proximately caused harm to Plaintiff in an amount to be determined at trial.

53.     Defendants' repeated breaches of its agreements with Plaintiff are deliberate, wanton, and willful and in reckless disregard for the rights of Plaintiff and others, resulting in harm to Plaintiff, to the music industry as a whole, and to the public interest in the integrity of contracts, all of which justifies the imposition of exemplary and punitive damages.

Accordingly, Plaintiff seeks punitive damages, plus reasonable attorneys' fees, interest, costs, and disbursements, in an amount to be determined at trial

### THIRD CAUSE OF ACTION

54.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs.

55.     By reason of the conduct described herein, and other acts not presently known to Plaintiff, Defendants have been unjustly enriched by the amount of the sums wrongfully withheld from Plaintiff.

56.     By reason of the foregoing, Plaintiff demands judgment against Defendants in an amount to be determined at trial of this action, plus reasonable attorneys' fees, interests, costs, and disbursements.

### FOURTH CAUSE OF ACTION

57.     Plaintiff repeats and re-alleges each and every allegation contained in foregoing paragraphs.

58.     By reason of the conduct described herein, by Defendants' abuse of the reasonable and justifiable confidence placed in them by Plaintiff, and as a result of Defendants' breach of their fiduciary responsibilities to Plaintiff, a constructive trust was created by operation of law on all royalties properly owed to Plaintiff.

### FIFTH CAUSE OF ACTION

59.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs.

60.     The Defendants' above-described breaches of their contractual and fiduciary duties to the Plaintiff were so material and substantial in nature that they affected and

eliminated the very essence of the relationship of the Defendants to the Plaintiff and defeated the object of the parties.

61.     As a result of the foregoing, there has been a failure of consideration to Plaintiff, as a result of which further enforcement of the parties' agreement would be unconscionable.

62.     As a result of the foregoing, all rights in and to Plaintiff's Masters have reverted in their entirety to Plaintiff, *ab initio*.

63.     By reason of the conduct described herein, the Defendants have forfeited any rights they may have obtained to any of the aforementioned master recordings by reason of their contractual and fiduciary relationships to the Plaintiff.

64.     Despite Defendants material breaches, Defendants have continued to unlawfully and/or wrongfully detain the aforementioned master recordings.

65.     Plaintiff does not have an adequate remedy at law for the injuries it has suffered as a result of Defendants' conduct. Accordingly, Plaintiff will suffer irreparable harm if equitable relief is not granted.

66.     By reason of the foregoing, Plaintiff demands judgment against the Defendants as follows:

      (a)     a declaratory judgment (i) that the Defendants' breaches of their contractual and fiduciary duties were so material and substantial that there has been a failure of consideration to Plaintiff, as a result of which enforcement of the parties' agreements would be unconscionable, (ii) that the Defendants have forfeited all rights and interests they obtained by reason of their contractual and fiduciary relationships with the Plaintiff,

and (iii) that all rights in and to the Master Recordings, including all copyrights therein and all renewal rights, have reverted in their entirety to Plaintiff, *ab initio*;

(b)     a permanent injunction (i) requiring delivery to Plaintiff of the Master Recordings and all derivatives thereof that are in possession, custody, or control of Defendants, (ii) enjoining Defendants from engaging in further sales of records, tapes, CDs, and recordings in any and all configurations that embody Plaintiff's Masters, and (iii) ordering that all documents, files, copyright certificates, and copies of all agreements of every kind of nature affecting or relating to the aforesaid recordings be delivered forthwith to Plaintiff;

(c)     a full and complete accounting to Plaintiff, at Defendants' expense, for all net profits earned on each and all of the Master Recordings together with judgment in favor of Plaintiff in the amount of such profits, with interest from the date such profits were earned; and/or

(d)     a declaratory judgment or a permanent injunction requiring Defendants to properly and fully account to Plaintiff, at Defendants' expense, in a timely manner as required under their contracts.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests Judgment against the Defendants as follows:

For judgment against all Defendants in an amount in excess of $75,000.00, awarding any and all monetary damages to which Plaintiff may be entitled, including all compensatory damages, whether direct or consequential, all statutory damages, all punitive,

exemplary, and/or treble damages, in an amount to be determined at the trial of this matter, plus all costs, interest, and attorneys' fees.

For equitable relief as follows: (a) a declaratory judgment (i) that the Defendants' breaches of their contractual and fiduciary duties were so material and substantial that there has been a failure of consideration to Plaintiff, as a result of which enforcement of the Cleveland-CBS Agreement would be unconscionable, (ii) that Defendants have forfeited all rights and interest they obtained by reason of their contractual and fiduciary relationships with the Plaintiff, and (iii) that all rights in and to the aforementioned master recordings which Defendants have obtained pursuant to the Cleveland-CBS Agreement, including all copyrights therein and all renewal rights, revert in their entirety to Plaintiff, *ab initio*; (b) judgment in Plaintiffs' favor (i) requiring delivery to Plaintiff of the aforementioned master recordings and all derivatives thereof that are in the possession, custody, or control of Defendants, (ii) enjoining Defendants from engaging in further sales of records, tapes, CDs, and recordings in any and all other forms or configurations of Plaintiffs' Masters, (iii) ordering that all documents, files, copyright certificates, and copies of all agreements of every kind or nature affecting or relating to the aforesaid recordings be delivered forthwith to Plaintiff; (iv) ordering that Defendants provide a full and complete accounting to Plaintiff, at Defendants' expense, for all revenue and/or profits derived from Plaintiff's Masters and judgment in Plaintiff's favor in the full amount of such revenues and/or profits with interest to the date of judgment; and/or (c) entering a declaratory judgment and/or permanent injunction requiring Defendants to properly and fully pay and account to Plaintiff in a timely manner as required under their contracts, and properly and fully comply with Defendants' labeling obligations.

For such other, further, and different relief as this Court may see as just and proper, including, but not limited to, costs, pre- and post-judgment interest, and reasonable attorneys' fees.

Respectfully submitted,

_____

Charles H. Cooper, Jr., Trial Counsel (0037295)
Rex H. Elliott,                                     (0054054)
Bradley A. Strickling                            (0080591)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio 43221
(614) 481-6000
(614) 481-6001 (Facsimile)

Attorneys for Plaintiff
The Estate of Stephen C. Popovich, Individually and as Successor in Interest to Cleveland Entertainment Co., Inc., by and through the Estate's co-executors, Stephen F. Popovich and Dominic Lemmo

## JURY DEMAND

Plaintiff demands a jury trial in this action by the maximum number of jurors permitted by law.

_____